## Borough of Warren, Appellant, *v.* The Public Service Commission.

*Public Service Commission — Water companies — Service — Quality of water—Complaints.*

The Public Service Commission is not empowered to require the performance of a private contract made between a water company and a municipality for the supply of a particular quality and quantity of water. It has, however, authority to require a water company to furnish an adequate supply of reasonably pure water as long as it exercises its charter powers.

Where on a complaint to the Public Service Commission against the quality of water furnished by a water company, the uncontradicted evidence is that the water had a bad taste, gave off an offensive odor, frequently carried a sediment, and was unsatisfactory for bathing purposes, it was error for the Public Service

Commission to dismiss the complaint, until it was satisfied that the methods adopted or to be adopted by the respondent company, to remedy the conditions complained of, had been effective.

Under such circumstances, the order of the commission dismissing the complaint will be reversed and the record remitted to that body to the end that the petition be retained until the respondent company can prove that the method of treatment of the water supplied by it has rendered it reasonably free from the odors, taste and discolorations complained against.

Argued April 25, 1922.   Appeal, No. 11, April T., 1922, by Borough of Warren, from order of the Public Service Commission, Complaint Docket No. 2638, in the case of Borough of Warren v. The Warren Water Company. Before ORLADY, P. J., PORTER, HENDERSON, TREXLER, KELLER, LINN and GAWTHROP, JJ.   Reversed.

Complaint by the Borough of Warren against the Warren Water Company that the said company was not supplying pure and wholesome water to the said borough and its inhabitants, and that its source of supply was not in accordance with the provisions of a contract entered into between the borough and the company.

The facts are stated in the opinion of the Superior Court.

The commission made the following order dismissing the complaint:

This matter being before the Public Service Commission of the Commonwealth of Pennsylvania upon complaint and answer on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been had, and the commission having on the date hereof made and filed of record a report containing its findings of fact and conclusions thereon, which said report is hereby approved and made part hereof:

Now, to wit, February 8, 1921, it is ordered: That the complaint in this cause be and the same is hereby dismissed.

It is further ordered: That the Warren Water Company, respondent, make a complete analysis of its water both raw and filtered once a month and furnish a copy of said tests to the local board of health.

*Error assigned* was the order of the commission.

*Earle MacDonald,* and with him *C. E. Bordwell,* for appellant.

*Frank H. Mason,* of the New York Bar, and with him *Warren R. Voorhis* and *William H. Allen,* for Warren Water Company, intervening appellee.

*Frank M. Hunter,* Counsel, and with him *John Fox Weiss,* Assistant Counsel, for the Public Service Commission.

OPINION BY HENDERSON, J., October 9, 1922:

In February, 1919, the appellant filed a complaint with the Public Service Commission against the Warren Water Company, setting forth that the water furnished by that company "Is not palatable; is dirty and filthy; has a bad odor; and at frequent intervals is unfit for any domestic purpose"; that complaints had frequently been made to the water company by residents of the borough, but that the company had neglected and failed to remedy such conditions.

It further appears from the complaint that on February 9, 1903, a contract was entered into between the Borough of Warren and the water company which provided among other things as follows:

"Section 4: To maintain the Morrison Run dam to a height sufficient to maintain storage capacity of the pond at that point as now constructed or build a new dam higher up the stream, so that the entire supply of water for the borough for domestic purposes, or as near as practicable, may be secured from this source."

"Section 6: The water company further agrees to furnish for a term of twenty years a sufficient quantity of pure water for domestic uses to meet the needs of the inhabitants of the borough at rates not to exceed," etc.

"Section 9: The company to provide the water for domestic purposes in the borough from Morrison Run or some running stream of equal purity or from wells put down on the island adjacent to or near the present pump house or in such other place or places as in the opinion of a competent hydraulic engineer will furnish first-class water."

The company commenced the delivery of water in the borough in 1882, its supply of water being obtained from the Allegheny River. Three years later it commenced to procure its principal supply from Morrison Run and its additional supply from the river. In 1890 the use of the river water was abandoned and wells were drilled on an island in the river near the pumping station. These wells and Morrison Run were the source of supply until 1907. Up to the latter date the water was unfiltered. The wells referred to were five in number, driven about sixty-five feet, comprising an eight-inch iron casing within which was a six-inch suction pipe connected to the pumping engines; the casing at the bottom resting on a stratum of gravel.

The water from these wells proved so unsatisfactory that the company determined to abandon the use of the wells and derive its supply from Morrison Run, and to the extent necessary, directly from the river. A filtration plant was constructed, and since that change in 1906 all the water supplied for domestic purposes has been taken from a reservoir on Morrison Run and directly from the river. During this period frequent complaints were made to the company and its superintendent of the quality of the water.

The particular objections to it were:

1. That it was frequently of a red color, and at other times white in appearance.

2. That it gave off an offensive odor.

3. That it had a bad taste.

4. That it frequently carried sediment.

5. When it was discharged into a bathtub a scum appeared on the surface, which made it unsatisfactory for bathing purposes.

The commission declined to take into consideration the contract between the borough and the company, for the reason that it had no power to specifically enforce a contract, and dismissed the petition; but ordered the water company to make a complete analysis of its water, both raw and filtered, once a month, and furnish a copy of its tests to the local board of health.

Section 10 of article VI of the Public Service Statute declares:

"Whenever the commission shall investigate any matter complained of, under the provisions of this act, it shall be its duty to make and file of record a written finding, determination, or order, either dismissing the complaint or directing the public service company or companies complained against to satisfy the cause of complaint, in whole or to such extent and within such time as the commission may specify, require and order."

This, of course, implies that in a case of dismissal the complaint is unfounded. But it nowhere appears in the report of the commission, nor is it found in the evidence, that the patrons had not a good reason for complaining about the quality of the water furnished to them.

More than two hundred residents of the borough testified in definite terms on this subject and supported specifically one or more of the objections to the quality of the water, set forth in the complaint. Not a resident of the borough was called to contradict this testimony; and indeed, it is found in the evidence of the water company that the complaint is in part well founded. This is inferentially found, also, in the report of the commission where, referring to the evidence on behalf of the

company showing efforts made to improve the quality
of the water, it is said:

"It thus appears that the respondent has taken steps
to correct all the causes of complaint. The hearings
closed before the testimony was available as to the re-
sults of the additional treatment which the company
was applying and preparing to apply for the elimination
of the odor, taste and discoloration in its supply."

The conclusion of the report is in these words:

"In our opinion its (the water company's) present
source of supply is adequate and the water can be made
reasonably pure and wholesome and free from any un-
pleasant odor, taste or discoloration."

This either has reference to a future condition of the
water or to a practical system of treatment by which the
supply can be made reasonably satisfactory. It is not a
finding that the water is reasonably pure and wholesome
and free from unpleasant odor, taste or discoloration.

Five witnesses were called in behalf of the water com-
pany, none of whom lived in Warren. Three of them
were at the time of the examination or had been in the
service of the company as engineers and chemists. The
testimony of the other two related principally to the
history of the water company and a description of its
source of supply. It does not appear that either of them
used the water supplied by the company. One of them
expressed the opinion that the supply of water is a rea-
sonably good one. Neither of them contradicted the
testimony of witnesses called in support of the com-
plaint. A considerable part of the evidence of the com-
pany's witnesses was directed to an explanation of the
causes of the unsatisfactory condition of the water. The
disagreeable taste was attributed by those who testified
on that subject to the presence of algæ in the water, and
of creosote discharged into the river from chemical plants
located on Kinzua Creek, a stream flowing into the river
about twelve miles above the intake station. The red
color was accounted for by the action of soft water on

the water pipes; and the turbidity, aside from the redness, was accounted for theoretically.

It is a significant fact that the superintendent of the company and the engineer who made the tests of the water were not called as witnesses, although they were presumably more familiar with the quality of the water and the actual result of the process of filtration and aëration than any other persons.

Reliance is placed by the water company on the reports made by the company to the state board of health and to the American Water Works and Electrical Company, which controls the Warren company. But it appears that these tests are made by a man who is neither a chemist nor biologist, and that they are only roughly made for the purpose of ascertaining whether the water contains infectious germs.

A considerable part of the evidence of the respondent is directed to a discussion of the means adopted for eliminating the odor, taste and color objected to; but it appears in the same evidence that steps were not taken in this direction until after this proceeding was instituted, and that they are still in process of development. The attempt to minimize the red water trouble was begun in May, after the first hearing before the commission. The chief engineer of the American Water Works Company was informed by the superintendent of the Warren company that the plan adopted had largely corrected that trouble but had not eliminated it but had bettered conditions materially. The device designed by the chief engineer for improving the taste by aëration had not been constructed at the time of the last hearing before the commission. It was supposed to be an improved process of aëration. It was not claimed however, that this would materially change the creosote taste. It was admitted by the chief engineer that a part of the outflow of Kinzua Creek was taken up at the pump station and the only remedy suggested for the removal of the creosote

was a change in the manufacturing plants on Kinzua Creek.

It thus appears that the defense presented was not that the facts were not, in a degree at least, as alleged by the complainant, but that the company, after the complaint was filed, with the commission, had taken steps looking to an elimination of the qualities complained of; the effect of which measures was prospective in part.

Stress is laid by the water company on the fact that it was not shown that there were deleterious germs in the water; but it is perhaps needless to remark that water may be unfit for domestic use that is not contaminated by germs capable of producing contagion.

In accepting its charter and entering on the service to be rendered to its patrons in Warren, an implied contract obligation arose to furnish water reasonably suited for domestic use; and color, odor and taste may be important factors in such fitness. The question for consideration before the commission was not whether an adequate water supply can be provided, but whether it had been provided before and was being provided at the time the complaint was filed, and as affecting the form of the order, whether at the time the hearings closed any reasonable ground of complaint theretofore existing and been remedied.

It appears from the evidence and is a fact of common knowledge, that the vicinity of Warren furnishes an abundant supply of wholesome water. Springs and mountain streams are numerous, and two streams in addition to Morrison Run are in proximity to that city. There is evidence to which we do not find a contradiction, that the capacity of Morrison Run could be so increased by an additional reservoir that a sufficient supply could be obtained from that stream. The reason given why the supply is not wholly taken from that source was the lack of sufficient storage capacity and the smallness (10-inch diameter) of the gravity pipe conducting the water from the reservoir to the filter plant. There is evidence on the

part of complainants tending to show that an abundance of good water could be acquired from Tionesta Creek. The objection suggested to that was that the expense would be too great. The calculation of expense was made at the time when material and labor were at the highest price, and a very different estimate would evidently be made at this time. No attempt was made by the company to provide an additional source of supply, and the company is apparently content to rely on that now in use.

Weight is attached to the fact that the State Board of Health approved the plan of the water company adopted in 1908, and that it has not found occasion to criticize reports forwarded by the water company; but it will be observed the gravamen of the charge of the complainants is not that the water is perilous to health, but because of odor, taste and color, it is unsuited for domestic purposes. No statute has been brought to our attention which gives the board of health jurisdiction of the subject except as it may affect public health, and the burden is not on the complainant to prove that these conditions of the water, if they exist, are prejudicial to the health of the patrons of the company.

Much of the evidence introduced in behalf of the respondent was incompetent in an inquiry having any of the features of a judicial proceeding, but we have carefully examined the whole record for the purpose of ascertaining what facts are disclosed therein relevant to the issue, and are of the opinion that the order appealed from is not reasonably supported by the evidence.

In view of the long period through which complaints were made to the water company of the unfit condition of the water, and the uncontradicted evidence of its condition from one-fourth to one-third or one-half of the year, we are of the opinion that the petition should not have been dismissed, but should have been retained until it could be ascertained that the methods adopted and proposed to be adopted by the water company were adequate

to the removal of the qualities in the water, to which so much objection had been made.

The complainants were put to large expense to show that the water was not of a quality which the company agreed to deliver, nor such as its charter obligation required it to deliver to its patrons; and after the disclosure made by their evidence and in view of the admissions contained in the evidence offered by the water company, their petition for relief ought not to be thrown out until it is made to appear that the methods adopted and to be adopted by the water company-have proved effective.

It is urged by counsel for the complainant that the obligation of the respondent is to specifically perform the contract entered into in 1903. But it will be observed that that contract was made with respect to conditions which have since changed, and which, to some extent at least, have been changed by the State Board of Health. Moreover the contract is not one imposed on the company by its charter. The Public Service Commission is without authority to specifically enforce such a contract. Its power is unquestioned to require the water company to furnish an adequate supply of reasonably pure water as long as it exercises its charter powers; but it is not empowered to require the performance of a private contract according to its terms. The question of the binding effect of the contract is one of law not cognizable by the Public Service Commission. The contract does, however, throw light on the understanding of the parties as to the quality of the water to be furnished to the borough, and gives support to the contention of the appellant that what has been supplied is not in the condition which the citizens of the borough had a right to expect.

The order of the Public Service Commission dismissing the complaint is reversed. The record is remitted to that body to the end that the petition be retained until it is made to appear by the Warren Water Company that by the method of treatment of the water supplied by it

to its patrons of the Borough of Warren, it is made reasonably free from the odors, taste and color which render it unfit for domestic use.

Costs to be paid by the Warren Water Company.