910 A.2d 38

**Irwin A. POPOWSKY, Consumer Advocate, Appellant,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellee,**

**Pennsylvania–American Water Company, Intervenor.**

Supreme Court of Pennsylvania.

Argued May 16, 2005.

Decided Nov. 21, 2006.

---

608

Joel Howard Cheskis, Esq., Dianne Elaine Dusman, Esq., Camp Hill, for Irwin A. Popowsky.

Charles M. Means, Esq., Mandi Lea Scott, Esq., Pittsburgh, for Collier Township.

Bohdan R. Pankiw, Esq., Wayne Thomas Scott, Esq., Robert James Longwell, Esq., Jaime Marie McClintock, Esq., Harrisburg, for Pennsylvania Public Utility Commission.

Anthony C. DeCusatis, Esq., Thomas Parker Gadsden, Esq., Susan Simms Marsh, Esq., Philadelphia, for Pennsylvania–American Water Company.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice CASTILLE.

The issue on appeal is whether a demonstration of public need for water alone is sufficient to require a water company to extend its water lines and service without receiving customer contribution, in an instance where the cost of the extension project would exceed the company's expected revenue from the extension. Because we find that the Public Utility Commission's ("PUC's") line extension regulations, which authorize a utility to require customer contribution in an instance such as this, are a proper application of statutory authority, we affirm.

On May 3, 2001, Cindy Parks filed a complaint with the PUC alleging that the town of Hickory in Mount Pleasant Township, Washington County, lacked public water that residents and property owners both needed and wanted.[1] The Township is located within the service territory of appellee/intervenor the Pennsylvania–American Water Company (the "PAWC" or the "utility"). On May 24, 2001, the PAWC filed an answer containing a general denial of the allegations in the

---

1. Pursuant to Rule 1952(b) of the Rules of Appellate Procedure, the PUC has filed a certified list of documents in lieu of an official record. Where necessary, we will rely upon the reproduced record supplied by the parties.

complaint and a request that the complaint be dismissed. The PAWC alleged that it was willing to provide water service to bona fide service applicants[2] in the Township pursuant to the terms of Rule 27 of its Tariff, which was approved by the PUC and filed in compliance with the PUC's line extension regulations.[3] Rule 27 governs main extensions for bona fide service applicants. The significance of the PAWC's allegation, briefly stated, is that the PUC's regulations (and Rule 27, which implements those regulations) permit a utility to require customer contributions to a water extension project if the cost of the project exceeds what the regulations require the utility to contribute.[4]

On June 14, 2001, the Office of Consumer Advocate ("OCA") filed a Motion of Intervention and Public Statement, stating that it intended to assist Parks and other Township residents to obtain public water at the lowest reasonable cost. After a pre-hearing conference, by letter dated January 25, 2002, the OCA requested an indefinite suspension of the litigation schedule because of an agreement between the parties that the PAWC would apply for a Penn Vest loan. Penn Vest

2. A "bona fide service applicant" is defined in the PUC's regulations as: "[a] person or entity applying for water service to an existing or proposed structure within the utility's certificated service territory for which a valid occupancy or building permit has been issued if the structure is either a primary residence of the applicant or a place of business." 52 Pa.Code § 65.1.

3. A tariff is defined in the Public Utility Code as "[a]ll schedules of rates, all rules, regulations, practices, or contracts involving any rate or rates, including contracts for interchange of service, and, in the case of a common carrier, schedules showing the method of distribution of the facilities of such common carrier." 66 Pa.C.S. § 102.

4. In 1999, the PAWC filed its Tariff with the PUC pursuant to Section 1501 of the Public Utility Code, 66 Pa.C.S § 101 *et seq.* Section 1501 provides in pertinent part that, "every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service." 66 Pa.C.S. § 1501. Consistently with Section 65.21 of the PUC's regulations, Rule 27 delineates, among other things, the circumstances under which an extension of service will occur, the formula by which the PAWC's required contribution will be calculated, the formula for calculating customer contribution when the costs of the extension exceed the company's contribution, the manner in which customer contributions must be forwarded, and financing for customer contributions.

loans are issued pursuant to the Pennsylvania Infrastructure Investment Authority Act, 35 P.S. §§ 751.1–751.20. The Act authorizes, *inter alia*, low-cost financing for water supply, sewage and stormwater projects to promote the health and safety of Pennsylvania citizens. *Id.* § 751.2. On January 28, 2002, an Administrative Law Judge ("ALJ") granted the OCA's request and suspended litigation. On July 18, 2002, however, the PAWC and the OCA apprised the ALJ that they were unable to reach an agreement.

On August 21, 2002, the OCA filed a complaint against the PAWC, alleging that the Township had an inadequate quantity and quality of water. The OCA requested that the PAWC be required, at the PAWC's sole expense, to extend its water service into the Township and alleged that the PAWC was in violation of Section 1501 of the Public Utility Code, 66 Pa.C.S. § 101 *et seq.*, which requires public utilities to extend water lines "as shall be necessary . . . for the accommodation, convenience and safety of its patrons, employees, and the public." *Id.* § 1501. On September 12, 2002, the PAWC filed an answer denying the claims made by the OCA, and asserting that it would extend service to bona fide service applicants if the terms of its Tariff were satisfied. Pursuant to that Tariff (and the PUC regulations it tracked), the PAWC claimed that it was obliged to expend $6200 per bona fide service applicant for the extension of water service, but the remainder of the cost of the project would have to be borne by the service applicants or some other entity on behalf of the applicants.

ALJ Larry Gesoff held evidentiary hearings on September 9, 2002 and December 3, 2002. Local residents, landowners and community leaders testified regarding the inadequate water supply and poor and unsafe quality of their water. Residents testified to problems they had encountered in accessing water, the costs they had expended in installing and maintaining equipment used to obtain, store and render potable their water supplies, and other costs attributable to having to turn elsewhere for water or water-related services (such as clothes laundering). Residents also testified to the danger posed in the event of a fire, as water for fighting fires must be

brought by tanker truck; indeed, one home was destroyed by fire because firefighters ran out of water, and another resident lost a barn and 110 sheep to a fire.

The parties disputed the question of whether the line extension project was one that would require customer contribution under the Commission's line extension regulations and the PAWC's Rule 27. The PAWC argued that the cost of the project would exceed its required investment, and thus it was entitled to request customer contribution as a condition of undertaking the project, while the OCA argued that the PAWC's required investment would be substantially more than the cost of the project, and thus, no customer contribution would be required. To understand the competing calculations requires some understanding of the operation of the regulations. The regulations provide a method for determining the investment required of the utility for each "bona fide service applicant." That per-applicant investment is then multiplied by the number of bona fide service applicants; the total dollar figure represents the utility's required investment. The utility's investment amount is then measured against the estimated cost of the project. If the utility investment exceeds the cost, no customer contribution is required. If the required utility investment is less than the project cost, however, contribution may be requested of bona fide service applicants, whose individual obligation is determined by simply dividing the cost difference by the number of applicants.

The PAWC produced evidence that the main line water extension project in the Township (as proposed by the OCA) would involve in excess of 83,000 feet of water mains and a one-million gallon storage tank, and would cost $6,290,499. Calculating its investment obligation, the PAWC assumed 744 new customers as bona fide service applicants.[5] Applying the algebraic formula set forth in Section 65.21(3) of the PUC's

5. The PAWC's number of 744 potential bona fide service applicants was calculated by taking the total possible customers (701) in the Township and adjusting for the 17 non-residential customers included in that figure. The 17 non-residential customers were deemed to be the equivalent of 60 residential customers. The PAWC thus used the following equation: 701–17 + 60 = 744. Supplemental Testimony of Jay Lucas, at 6.

regulations, the PAWC claimed, it would be required to invest $6,200 for each bona fide service applicant.[6] (In contrast, the utility noted, its investment in its existing facilities servicing existing customers was only $2,309.) Multiplying its per-applicant obligation by the 744 applicants it projected, the PAWC calculated its required investment in the project to be $4,612,800 (744 × $6,200). Taking the $1,677,699 difference between the cost of the project and its required investment, the PAWC then calculated the customer contribution of each bona fide service applicant to be $2,255 (*i.e.*, $1,677,699 ÷ 744). The actual contribution could be either more or less depending upon how many residents actually took service upon completion of the project, and indeed, under the regulations, the PAWC would be obliged to provide refunds to the original service applicant-contributors if additional customers attached to the new water mains in the ensuing ten years.[7]

The ALJ ultimately rejected the 744 figure because it assumed that the Township would pass a mandatory connection ordinance or otherwise underwrite the project, which the ALJ deemed "unlikely to occur."

**6. Section** 65.21(3) provides as follows:

The utility's investment for the line extension shall be based on the following formula, where X equals the utility's investment attributed to each bona fide applicant:

$X$ = [AR–OM] divided by [I + D]; and,
$AR$ = the utility's annual revenue
$OM$ = the utility's operating and maintenance costs
$I$ = the utility's current debt ratio multiplied by the utility's weighted long-term debt cost rate
$D$ = the utility's current depreciation accrual rate

52 Pa.Code § 65.21.

The PAWC calculated its obligation per bona fide service applicant as follows:

| | |
|---|---|
| Average Annual Revenue: | $ 424 |
| **Less:** Operating and Maintenance Expense: | $ 104 |
| Subtotal: | $ 320 |
| **Divided by:** | |
| | |
| Depreciation Rate for 8″ mains: | 1.08% |
| Plus: Weighted Cost of Debt: | 4.08% |
| | |
| Composite Rate: | 0.0516 |
| Company Investment: | $6,200 |

**7.** New water customers would be able to finance their contribution by paying the utility a one-third down payment and then paying the

The OCA countered with evidence that the extension project should only cost $5.3 million. N.T.12/3/2002, at 393. The OCA's calculation was supported by the testimony of Terry L. Fought, a self-employed consulting engineer, who stated that the PAWC's project estimate included water mains that were oversized, pumping stations and tanks designed to serve more customers than had indicated an interest in the service, and facilities that would improve service to existing customers. Direct Testimony of Terry L. Fought, at 5. The OCA's calculations also differed from the PAWC's because the OCA assumed a Penn Vest interest rate of 1.387% in the debt portion of the formula, rather than the 4.08% rate the utility employed. Finally, the OCA suggested that there were 568 potential bona fide service applicants.[8] Based upon these figures, the OCA argued that the PAWC's investment obligation would be $12,971 per bona fide service applicant for a total project obligation of $7,367,528, a figure well in excess of the OCA's estimated project cost of $5.3 million, and also in excess of the PAWC's estimate of the project cost.[9] Under

balance over a period of three years at an interest rate equal to the utility's cost for long-term debt. The PAWC also identified three banks in Washington County offering home equity loans at 4.75%. The pre-tax cost of the loan, it was estimated, would be less than $30 per month. Supplemental Testimony of Paul T. Diskin, at 6–7.

8. The OCA's number of potential bona fide service applicants was based upon the results of a survey of 701 residents. Of the 530 residents who responded to the survey, 430 (or 81%) stated that they would connect to the public water system so long as customer contribution was not required. The OCA "extrapolated" from this response the inclinations of those who had not responded and then estimated a total of 568 (81% of 701) prospective customers in the Township.

9. The OCA calculated PAWC's obligation per bona fide service applicant as follows:

| | |
|---|---|
| Average Annual Revenue: | $ 424 |
| **Less:** Operating and Maintenance Expense: | $ 104 |
| Subtotal: | $ 320 |
| **Divided by:** | |
| Depreciation Rate for 8" mains: | 1.08% |
| Plus: Weighted Cost of Debt: | 1.387% |
| Composite Rate: | 0.02467 |
| Company Investment: | $12,971 |

the OCA's evidence, the break-even point for the PAWC under the regulatory formula would require only 409 bona fide service applicants. N.T. 12/3/2002, at 393.

In a comprehensive, 89–page decision and order filed on April 16, 2003, ALJ Gesoff dismissed the complaints. Relevant to the issue before this Court, the ALJ found that the Township was in need of a dependable water source due to the diminishing quantity and quality of the water available, but that the need for water alone did not oblige the PAWC to extend its service without customer contribution. Instead, the ALJ found that the application of the PUC line extension regulations, and the PAWC's tariff, were reasonable, and that application of those regulations would require customer contribution. In reaching this conclusion, the ALJ accepted the PAWC's weighted cost of debt and its estimated cost of the project. *PUC Initial Decision*, at 56–70.[10] The ALJ also rejected the OCA's argument that an exception to the regulations and their application was appropriate.

The OCA filed exceptions to the ALJ's order with the PUC and the PAWC filed reply exceptions. In an opinion and order entered on August 8, 2003, the PUC denied the OCA's exceptions, adopted the ALJ's Initial Decision to the extent it was consistent with the PUC's opinion and order, and dismissed the complaints. The PUC rejected the OCA's argument that the demonstration of public need alone requires the extension of water lines at the utility's expense, noting that it had already considered and rejected that argument in previous cases, including a challenge brought by the OCA to the PAWC's adoption of its Tariff Rule 27. Opinion and Order at 5, *citing Popowsky v. Pennsylvania–American Water Co.*, Docket No. R–00943155C001, 1997 Pa. PUC LEXIS 142 (order entered June 9, 1997). In the prior decision, the PUC had noted that, although the OCA's suggestion of such a duty upon the part of the utility "is an interesting social program," neither the Commission nor the courts had required it, and

10. Given the limited nature of the issues properly before us, see note 12 *infra,* the reasons for the ALJ's crediting PAWC's position in this regard are of no moment.

such a program "would make the utility the provider of last resort without regard to cost."

The PUC also dismissed the OCA's claim that the PUC should waive the regulations upon a showing of compelling need. The PUC acknowledged that it had the authority to waive a requirement in its regulations, but only if the waiver would not adversely affect the substantive right of a party. *Id.* at 7. The PUC then went on to explain at some length why the waiver/exception posed by the OCA was neither required nor acceptable:

> [The PUC's line extension] regulations were approved by the Commission's Order entered on October 7, 1996.... Following approval by the Independent Regulatory Review Commission (IRRC) and the applicable committees of the Pennsylvania House and Senate, the regulations and the Commission['s] October 7, 1996 Order were published at 27 *Pennsylvania Bulletin* 799 *et seq.* (February 15, 1997). The final line extension regulations were three years in the making and reflect the Commission's definitive statement of how requests for main extensions by "Bona Fide Service Applicants" are to be resolved.

> We also note that ignoring the existence of our line extension regulations, as advocated by the OCA, would open the door to a pattern of burdensome, case-by-case litigation of requests for line extensions. As the Commission made clear in its October 7, 1996 Order, our line extension regulations were adopted for the express purpose of supplanting case-by-case adjudications, which experience had shown to be unacceptable. (27 *Pa. Bull.* at 800.) Yet the broad "exception" urged by the OCA in this proceeding, *i.e.,* a "public need" exception, would make virtually all line extensions subject to such burdensome case-by-case litigation. Therefore, we find that this case is governed by our regulations on line extensions and that the presiding ALJ applied the appropriate standard of review.

*Id.* In response to additional objections from the OCA, the PUC further upheld the ALJ's determinations that, *inter alia:* (1) under the regulatory definition of the term, there were no

bona fide service applicants, and thus, the OCA could not show that the utility-required investment would exceed the cost of the project; (2) OCA's proffered use of a Penn Vest interest rate in computing the utility-required investment was inappropriate; and (3) PAWC's estimate of the cost of the project was accurate.

The OCA then appealed to the Commonwealth Court, which affirmed in a divided, published, *en banc* decision. *Popowsky v. Pennsylvania Public Utility Comm'n,* 853 A.2d 1097 (Pa. Cmwlth.2004) *(en banc).* The panel majority, per the Honorable Mary Hannah Leavitt, summarized the issues as follows: (1) whether the PUC's application of its line extension regulations violated Pennsylvania case law holding that a utility must bear the capital expense of extending service where there is a public need for that service; (2) whether the PUC'S acceptance of the PAWC's interpretation of Rule 27 of its Tariff "nullified" the PUC's duty to adjudicate complaints pursuant to the Public Utility Code; and (3) whether the PUC's decision was supported by substantial evidence.

Respecting the first question, the majority noted that it was undisputed that the PUC's regulations were adopted in compliance with the requirements of the Commonwealth Documents Law, 45 Pa.C.S. § 1102 *et seq.,* the Commonwealth Attorneys Act, 71 Pa.C.S. § 732–204(b), and the Regulatory Review Act, 71 P.S. §§ 745.1–745.15. The OCA argued, however, that the regulations as so adopted conflicted with a duty every utility has under Section 1501 the Public Utility Code to provide service to the public where a need for such service is established. In the OCA's view, the PUC was obliged to allow for an exemption from customer contributions on a case-by-case basis in "public need" instances where such an exemption would not cause the utility "material, economic harm."

Before analyzing the OCA's public need claim, the majority outlined the history and purpose of the PUC's regulations. The majority began by citing Section 1501 of the Code, which expressly authorizes a utility, with the approval of the PUC, to adopt "reasonable rules and regulations governing the conditions under which it shall be required to render service." 66

Pa.C.S. 1501. The majority then noted that the PUC had determined that it was reasonable to require customer contribution to a main extension "if necessary to prevent the utility from a negative return on investment, *i.e.,* the utility must realize at least a 'break even' return on mandated extensions." 853 A.2d at 1104. The majority further noted that the PUC had spent three years finalizing the line extension regulations; that the regulations expressed the PUC's "definitive statement" of the "reasonable conditions" under which public utilities were required to provide main extensions to bona fide service applicants; and that, in adopting the conditions, the PUC balanced the needs of the bona fide service applicant seeking the extension against " 'the right of the public utility to remain financially viable and the right of existing customers to avoid subsidizing uneconomic line extensions for new customers.' " *Id.* at 1104 (quoting 27 Pa. B. 799, 800 (1997)) (setting forth regulations) (majority's emphasis deleted). Finally, the majority quoted the PUC's statement of purpose respecting the regulations: " 'the purpose of this rulemaking is to create a fair, reasonable, and predictable economic standard to address this regulatory problem that will eliminate uncertainty and greatly reduce the litigation in this area.' " *Id.*

With this background in mind, the majority turned to the OCA's public need argument, noting that the OCA principally relied upon *Ridley Township v. Pennsylvania Public Utility Comm'n,* 172 Pa.Super. 472, 94 A.2d 168 (1953), which it cited for the proposition that public utilities must provide service without customer contribution unless the utility can demonstrate "material economic harm to the utility or undue burden upon existing customers." The majority disagreed with the OCA's reading of *Ridley Township,* concluding that, in fact, that case recognized that the PUC has discretion to determine when customer contribution is appropriately required for a line extension project, and noting that subsequent appellate cases support this reading of the case. 853 A.2d at 1105–06, citing *Colonial Products Co. v. Pennsylvania Public Utility Comm'n,* 188 Pa.Super. 163, 146 A.2d 657 (1958) and *Lynch v.*

*Pennsylvania Public Utility Comm'n,* 140 Pa.Cmwlth. 599, 594 A.2d 816 (1991). Moreover, *Ridley Township* could not be deemed dispositive because it predated enactment of the line extension regulations and, the majority reasoned, an agency is not bound to follow a narrow interpretation in a prior appellate case that was rendered in the absence of such regulations.

The majority went on to note that Section 1504 of the Public Utility Code provides the PUC with the express power to prescribe by regulation "just and reasonable standards ... to be furnished, imposed, observed and followed by any and all public utilities." 66 Pa.C.S. § 1504(1). The majority further noted that, in its order adopting the line extension regulations, the PUC stated its belief that the regulations were consistent with *Ridley Township* because "a negative equity return is a material handicap." 853 A.2d at 1106. The majority then explained that Rule 27 of the PAWC's tariff was approved by the PUC because it satisfied the standards outlined in the regulations.

Turning to the effect of the regulations, the majority noted that agency regulations are binding on the court so long as they are in accord with the power delegated to the agency, are enacted with proper procedures, and are reasonable; and an agency's interpretation of its own regulations will be deemed controlling unless it is plainly erroneous or inconsistent with the regulation. 853 A.2d at 1106, citing *Moyer v. Berks County Bd. of Assessment Appeals,* 803 A.2d 833, 842 (Pa. Cmwlth.2002). In the case *sub judice,* the majority found, the PUC's interpretation of the regulations was not clearly erroneous and the regulations themselves were consistent with the judicial interpretation of Section 1501, as found in *Ridley Township* and its progeny. Accepting the OCA's "public need" exception, the majority reasoned, would vitiate the line extension regulations and would mean that all line extension disputes would be subject to "ponderous and protracted case-by-case litigation," which was precisely the result the regulations were designed to avoid. Thus, the majority concluded, the PUC did not err in applying its regulations in this case, and the complaints were properly dismissed.

The majority then turned to the OCA's argument that application of the "break-even" analysis codified in the regulations "nullified" the PUC's duty to adjudicate individual consumer complaints. The majority recognized this argument to be "simply a rephrasing" of the OCA's primary argument that the utility must bear all costs where a public need is established. In addition to disputing that there would be no role for the PUC under the regulation, the majority rejected the core of the argument as follows:

> The fact that the PUC has established standards that give meaning to the requirement in Section 1501 that a utility establish "reasonable conditions" for extending service is not an abdication of responsibility. To the contrary, giving precision to what otherwise may be characterized as an open-ended statute is a proper exercise of the PUC's responsibility.

853 A.2d at 1107–08 (footnote omitted).

Finally, the majority discussed at some length, and ultimately rejected, the OCA's fact-bound claim that the order of the PUC was not supported by substantial evidence. Since the propriety of that determination was not challenged in the allocatur petition in this matter, *see* discussion *infra*, the specifics of the claim, and the court's reasoning, are of no moment here.

Judge Smith–Ribner authored a dissenting opinion, which President Judge Colins joined. The dissent confined itself to the OCA's public need argument. The dissent noted that the "break-even" formula adopted in the PUC's regulations determines a utility's financial obligation for service extension by looking only to "costs and revenue, without separate regard for the degree of public need for the service extension." In the dissent's view, the PUC's "categorical" exclusion of public need as an independent factor in determining whether customer contributions should be required "contravenes" Section 1501's "mandate ... that a public utility 'shall make all such ... extensions ... as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.'" *Popowsky,* 853 A.2d at 1111

(Smith–Ribner, J., dissenting), quoting 66 Pa.C.S. § 1501. The dissent did not dispute that customer contribution might be deemed appropriate where there is no demonstrated public need or where the costs in extending service would be prohibitive to the utility or risk its ability to earn a fair return on its entire operation; but, the dissent maintained, the Commission had to recognize public need as a relevant factor and in some instances it might be a determinative factor. Because the record in the case *sub judice* demonstrated a public need for the extension, the dissent concluded, the PUC should have waived its regulations and made a determination regarding the degree of service extension required to ensure the public health and safety. *Popowsky*, 853 A.2d at 1111–12 (Smith–Ribner, J., dissenting).

▪ The OCA petitioned this Court for further review, raising three questions which, in actuality, were all permutations of a basic claim concerning whether the Commonwealth Court and the administrative tribunals erred in determining that a demonstrated public need for water alone is not enough to require a water utility to extend service without customer contribution under Section 1501. We granted review.[11]

11. The OCA's petition for allowance of appeal contained the following questions:

 1. Whether the Commonwealth Court erred by failing to require a utility to forward the costs of line extension without customer contribution upon a showing of public need?
 2. Whether the Commonwealth Court erred in its determination that the line extension regulations were consistent with Section 1501 of the Public Utility Code?
 3. Whether the Commonwealth Court erred in finding that the PUC did not abuse its discretion when it required customer contributions even though there had been a demonstration of public need?

In its appellate brief, however, the OCA lists these two additional questions:

 4. Whether the PUC's decision that the project was uneconomical was supported by substantial evidence?
 5. Whether the PUC erred by dismissing the complaints on the grounds that there were no bona fide applicants?

Brief for Appellant, at 7. The OCA fails to acknowledge that it did not seek review of these questions in its allocatur petition, much less does it explain why it believes it is entitled to consideration of them. Because the additional questions were not the subject of our grant of review, we

 Appellate review of a PUC order is limited to determining whether a constitutional violation, an error of law, or a violation of PUC procedure has occurred and whether necessary findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704; *Rohrbaugh v. Pennsylvania Public Utility Comm'n,* 556 Pa. 199, 727 A.2d 1080, 1084 (1999). The questions on appeal involve the proper interpretation of the Public Utility Code and the validity of the line extension regulations promulgated by the PUC pursuant to that Code. The OCA essentially alleges errors of law with respect to these points. Since the issues so posed are questions of law, this Court's review is plenary. *Street Road Bar & Grille, Inc. v. Pennsylvania Liquor Control Bd.,* 583 Pa. 72, 876 A.2d 346, 352 (2005).

 The core of the dispute centers on the meaning of Section 1501 of the Code, and the congruence of the PUC's regulations with that provision. Section 1501 provides as follows:

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the commission. Subject to the provisions of this part and the regulations and orders of the commission, every public utility may have reasonable rules and regulations governing the conditions under which it

will not consider them. *See Continental Ins. Co. v. Schneider, Inc.,* 582 Pa. 591, 873 A.2d 1286, 1294 n. 11 (2005).

We also note that the OCA confuses matters further because its argument is divided into 12 parts with no attempt to relate the dozen parts back to any particular question. Again, we will consider only those points arguably encompassed in the allocatur grant and argued with relevance and specificity in the appellate brief. We caution the OCA that this lack of order and focus alone could warrant dismissal of the appeal as improvidently granted.

shall be required to render service. Any public utility beyond its corporate limits shall be subject to regulation and control by the commission as to service and extensions, with the same force and in like manner as if such service were rendered by a public utility. The commission shall have sole and exclusive jurisdiction to promulgate rules and regulations for the allocation of natural or artificial gas supply by a public utility.

66 Pa.C.S. § 1501. The PUC has adopted regulations that address the instances in which a public utility company is required to extend its services. 52 Pa.Code §§ 65.1–65.23. Section 65.21, entitled "Duty of public utility to make line extensions," addresses when customer contributions (advances) may (or may not) be required of bona fide service applicants, adopting what is indeed essentially a "break-even" analysis:

Each public utility shall file with the Commission, as part of its tariff, a rule setting forth the conditions under which facilities will be extended to supply service to an applicant within its service area. Upon request by a bona fide service applicant, a utility shall construct line extensions within its franchised territory consistent with the following directives:

(1) Line extensions to bona fide service applicants shall be funded without customer advance if the annual revenue from the line extension will equal or exceed the utility's annual line extension costs.

(2) If the annual revenue from the line extension will not equal or exceed the utility's annual line extension costs, a bona fide service applicant may be required to provide a customer advance to the utility's cost of construction for the line extension. The utility's investment for the line extension shall be the portion of the total construction costs which generate annual line extension costs equal to annual revenue from the line extension. The customer advance amount shall be determined by subtracting the utility's investment for the line extension from the total construction costs.

52 Pa.Code § 65.21. Subsection (3) sets forth the algebraic formula for computing the utility's required investment. *See supra* n. 6.

The parties track the positions they established in the proceedings below. The OCA focuses on the language in Section 1501 providing that utilities shall make all extensions "as shall be necessary or proper for the ... safety of its patrons, employees and the public." The OCA construes the statute as dictating that utilities are required to provide line extensions upon a showing of public need alone, and thus the PUC's regulations must account for public need. The OCA argues that there clearly was a showing of public need for water service in the case *sub judice* and the Commonwealth Court majority ignored the statutory mandate that that need be considered.[12] The OCA differentiates public utilities from unregulated businesses and argues that the PAWC is a territorial monopoly, which has a statutory duty to provide line extensions to communities within its territory that have a demonstrated need for public water service.

In support of its position, the OCA relies upon *Ridley Township* and a 1992 policy statement from the PUC declaring that the holding in *Ridley Township* was the policy of the Commission.[13] It claims that *Ridley Township* requires utilities to shoulder the costs required to extend typical residential service, unless the extension would prevent the utility from earning a return on its overall operations or would become an undue burden on existing customers. The regulations, the OCA contends, are inconsistent with *Ridley Township*.

12. There is no dispute that safe water implicates public safety. *See* PA. CONST. Art. 1, § 27 ("The people have a right to clean air, pure water ..."); 35 P.S. § 721.2(a)(1) ("An adequate supply of safe, pure, drinking water is essential to the public health, safety and welfare ..."); *Hatfield Township v. Lansdale Mun. Auth.*, 403 Pa. 113, 168 A.2d 333 (1961) (recognizing direct connection between adequate supply of safe water and public health, safety and general welfare).

13. The 1992 policy statement was adopted at a public meeting held on August 20, 1992 and published in *The Pennsylvania Bulletin* on September 19, 1993.

The OCA also argues that the case law suggests that line extension disputes fall into two categories: those where there is a demonstrated need for ordinary residential service, and those where an individual or a developer seeks a particular type of special service. Citing *Lynch v. Pennsylvania Public Utility Comm'n*, 140 Pa.Cmwlth. 599, 594 A.2d 816 (1991), the OCA contends that customer contribution for construction is appropriate when an applicant requests a special service or a developer seeks a line extension to its project. The OCA cites *Riverton Consolidated Water Co. v. Public Service Comm'n*, 105 Pa.Super. 6, 159 A. 177 (1932), as an instance where the PUC required a utility to provide a line extension even when doing so would not result in an immediate profit for that utility. *See also McCormick v. Pennsylvania Public Utility Comm'n*, 48 Pa.Cmwlth. 384, 409 A.2d 962 (1980); *Philadelphia Rural Transit Co. v. Public Service Comm'n*, 103 Pa.Super. 256, 158 A. 589 (1931).

The OCA further argues that the PUC's interpretation and application of the statute and the line extension regulations in this case is inconsistent with the meaning and intent of Section 1501 and is unreasonable. The OCA contends that the PUC failed to implement the plain language of Section 1501, neglected to give effect to all of the Code's provisions, and ignored its responsibility to consider public interest over private concerns. Thus, the OCA contends, even though the PUC had the authority to promulgate the line extension regulations and did so in a procedurally proper manner, the regulations should be overturned because their application and interpretation produced an unlawful result here.

Finally, the OCA argues that requiring the utility to extend service without new customer contribution would not result in an ultimate loss to the utility because the utility would benefit from the revenue generated by new customers. Traditionally, it argues, rates are determined by averaging all costs associated with a particular customer class; thus, utilities do not charge individual customers for the costs of repairs to their specific lines. Such principles, the OCA contends, should also be considered in line extension cases. The OCA suggests that

the PAWC has repeatedly requested base rate increases and through such future increases will recover the costs of extending service.

The PAWC and the PUC have filed separate briefs, each arguing that the Commonwealth Court's decision was consistent with the Public Utility Code, the line extension regulations, and applicable Pennsylvania case law. They contend that the regulations were a proper exercise of the PUC's rulemaking authority and provide a uniform standard under which customers may be required to pay a portion of initial construction costs, but in instances where the annual revenue expected from the line extension does not equal or exceed the annual line extension costs.

The PAWC notes that the current regulations were established in response to a massive amount of litigation arising from a prior policy of case-specific review for all disputed line extension cases. The problems with the prior policy also led to the rescinding of the 1992 policy statement relied upon by the OCA. In response to the claim that the regulations ignore public need, the PAWC explains that, when a bona fide service applicant applies for the extension of service, the PUC's regulations presume the existence of public need, as demonstrated by the distinction the regulations draw between developers and bona fide service applicants.[14] The PAWC argues that the OCA's current "public need" proposal would require a return to the case-by-case analysis that already proved to be unworkable and unfair because it requires an evaluation of the affected utility's financial condition upon each receipt of an

**14.** Section 65.1 of the PUC's regulations provides that a person will not be deemed a bona fide service applicant if any of the following apply:
 (i) The applicant is requesting water service to a building lot, subdivision or secondary residence.
 (ii) The request for service is part of a plan for the development of a residential dwelling or subdivision.
 (iii) The applicant is requesting special utility service.
52 Pa.Code § 65.1. The PAWC contends that utility investment is only required when a bona fide service applicant is requesting an extension of service. If anyone else requests an extension, the utility is not required to contribute to the costs of constructing the lines because there is no public need for service. PAWC Brief, at 17.

additional line extension request. The PAWC also claims that the OCA's proposal has an arbitrary and discriminatory effect because an applicant's obligation to advance a customer contribution could depend upon mere timing: *i.e.*, when the customer applied for an extension relative to other prospective customers who also applied for line extensions.

The PAWC further disputes the OCA's argument that the plain language of Section 1501 requires the PAWC to bear the cost of line extension upon a showing of public need. Citing this Court's decision in *Rohrbaugh*, the PAWC argues that Section 1504 confers on the PUC the authority to adopt regulations regarding a utility's obligation arising from Section 1501. It further contends that the plain language of Section 1501 provides for the establishment of regulations and that these legislative regulations must be shown deference by the courts as they fairly balance the interests of utilities, existing customers, and prospective customers. The PAWC also claims that because new customers will receive a refund if additional customers attach to the extended main, the utility does not profit at all on line extensions funded in part by customer contributions.

The PAWC also notes that Section 1501 applies to all aspects of utility service and that if a utility's service obligation were as absolute as the OCA contends, the PUC would be precluded from adopting regulations that condition any aspect of utility service, including the requirement that customers pay rates. The PAWC contends that a plain reading of Section 1501 can reasonably allow for both rates and customer contribution to line extension and that the regulations at issue here do not relieve the PAWC of its obligation to extend its service lines, they just require bona fide service applicants to contribute to such extensions in instances where the utility otherwise would not break even on the extension investment.

The PAWC emphasizes that the regulations were established by the PUC and the PUC has special expertise regarding utility law. The criteria set forth in the regulations, the PAWC contends, represent an exercise of the PUC's ratemak-

ing authority and this authority is subject to appropriate deference by the courts. The PAWC further notes that the regulations are presumptively valid and reasonable and the Independent Regulatory Review Commission deemed them to be consistent with the public interest.

In its brief, the PUC notes that it explained the purpose and meaning of its regulations in the order which adopted the regulations. That order indicated that the PUC recognized that it was required to balance the interests of potential customers, existing customers, and the utilities, and had concluded that there is no obligation for a utility to make line extensions "which are uneconomic or unreasonable." OCA Brief, at 16 (citing 27 Pa. Bull. 799, 800). The PUC suggests that the purpose of the formula in the regulations (which sets forth the utility's required contribution) is to allow the utility to avoid an out-of-pocket loss that ultimately would be passed on to existing customers. Citing *Lynch*, 594 A.2d at 818, the PUC argues that customers may be required to contribute to line extension costs unless they can show that there is a public necessity for the extension and that the extension will yield a positive return of investment for the utility. The PUC also contends that the OCA's reliance on *Ridley Township* is an attempt to re-litigate an issue that was considered by the PUC during the enactment of the regulations and was rejected in the final version of those regulations.

The PUC does not dispute that utilities may be required to extend service upon a showing of public need, but it emphasizes that, contrary to the OCA's argument, utilities are not always required to do so at their sole cost. Instead, customer contribution may be required where the utility's annual line extension costs will exceed the annual return on the service extension. The PUC argues that the OCA fails to recognize the language in Section 1501 which empowers the PUC to establish regulations "governing the conditions under which [utilities] may be required to render service." 66 Pa.C.S. § 1501. The PUC argues that, when read in its entirety, Section 1501 clearly bestows upon the PUC the power to

determine when customers will be required to contribute to the cost of a line extension.

Finally, the PUC argues that an agency's interpretation of its regulations are entitled to deference as long as the interpretation is consistent with the statute and the legislative intent, and are narrowly construed. The PUC claims that in this case, it lawfully applied the line extension regulations. The PUC also contends that the regulations are binding on the courts because they are within the scope of the delegated power, were properly enacted, and are reasonable. Likewise, the PUC claims that the PAWC's tariff, and the PUC's interpretation of it, is binding on the courts because it is not discriminatory or unreasonable.

When this Court reviews an administrative agency's interpretation of its own regulations, we must follow a two step analysis. "First, '[i]n construing administrative regulations, the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation. . . .' Second, the regulations 'must be consistent with the statute under which they were promulgated.'" *Commonwealth of Pennsylvania, Dept. of Public Welfare v. Forbes Health System,* 492 Pa. 77, 422 A.2d 480, 482 (1980) (citations omitted).

Here, the administrative agency—the PUC—interpreted its line extension regulations as authorizing a utility to require contributions from bona fide service applicants if the cost of the extension project to the utility will exceed the expected return on the extension. This interpretation is wholly consistent with the plain language of the regulations. Indeed, the regulations include an algebraic equation used to determine the amount of utility (and ultimately customer) contribution. Therefore, we find that the PUC's interpretation of the regulation was correct and consistent with the regulation itself.

Turning to the question of whether the regulation itself is consistent with the statutory delegation of authority, we first note the importance of considering the type of regula-

tion at issue. Historically, this Court "has long recognized the distinction in administrative agency law between the authority of a rule adopted pursuant to an agency's legislative rule-making power and the authority of a rule adopted pursuant to interpretive rule-making power." *Elite Industries, Inc. v. Pennsylvania Public Utility Com'n*, 574 Pa. 476, 832 A.2d 428, 431 (2003). *See also Girard School Dist. v. Pittenger*, 481 Pa. 91, 392 A.2d 261, 262 (1978). Legislative rule-making is "an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the legislative body, and is valid and is as binding upon a court as a statute if it is[:] (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Rohrbaugh*, 727 A.2d at 1085, citing *Girard School Dist.*, 392 A.2d at 263, citing K.C. Davis, 1 Administrative Law Treatise § 503, at 299 (1958). *See also Housing Authority of the County of Chester v. Pennsylvania State Civil Service Comm'n*, 556 Pa. 621, 730 A.2d 935, 942 (1999). An appellate court, in reviewing such regulations, may not substitute its own judgment for that of the agency. *Rohrbaugh*, 727 A.2d at 1085. To overturn these sorts of regulations, it is not sufficient that they are "unwise or burdensome or inferior to another regulatory scheme;" rather, they must be so "entirely at odds with fundamental principles as to be the expression of a whim rather than an exercise of judgment." *Id.; Housing Authority of the County of Chester*, 730 A.2d at 942. As a consequence, we have recognized, "an agency may revise its policies and amend [such] regulations in interpreting its statutory mandates. Further, past interpretation of a statute, though approved by the judiciary, does not bind the PUC to that particular interpretation." *Elite Industries*, 832 A.2d at 431–32.

In the *Girard School District* case, this Court noted the very different review accorded when a mere interpretive rule is at issue:

"An interpretative rule on the other hand depends for its validity not upon a Law-making grant of power, but rather upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets. While

courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court, and, when convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent, courts disregard the regulation. *See, e.g., United States v. Cartwright,* 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)."

392 A.2d at 263 (quoting *Uniontown Area School Dist. v. Pennsylvania Human Relations Comm'n,* 455 Pa. 52, 313 A.2d 156, 169 (1973)).

 Here, the line extension regulations were adopted pursuant to 66 Pa.C.S. § 1504(1), which vests broad powers in the PUC:

The commission may, after reasonable notice and hearing, upon its own motion or upon complaint:

(1) Prescribe as to service and facilities, including the crossing of facilities, just and reasonable standards, classifications, regulations and practices to be furnished, imposed, observed and followed by any or all public utilities.

In *Rohrbaugh,* this Court recognized that the rule-making power conferred by this provision is legislative in nature. 727 A.2d at 1085.[15] Therefore, to be binding, the regulations must fall within the power delegated to the PUC, be enacted according to proper procedures, and be reasonable. *Id.*

 The OCA concedes that the PUC was authorized to establish the line extension regulations. The OCA also concedes that the regulations were adopted in a procedurally lawful manner. The OCA disputes, however, whether the regulations were (1) within the delegated power and (2) rea-

---

15. The OCA claims that the PUC obtains its authority to promulgate the regulations from 66 Pa.C.S. § 501. The Commonwealth Court found that the PUC gleaned its authority from Section 1501 of the Public Utility Code. *Popowsky* 853 A.2d at 1103–04. Although Sections 501 and 1501 certainly support that the PUC has the authority to adopt regulations, the source of this authority comes from Section 1504(a). *Rohrbaugh,* 727 A.2d at 1084.

sonable. On the delegated power point, the OCA essentially argues that requiring customer contribution in an instance where an extension is necessary for public need is beyond the power delegated to the PUC because the first sentence in Section 1501 mandates that, "[e]very public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such ... extensions ... as shall be necessary or proper for the ... safety of its patrons, employees, and the public." When an extension is necessary for public safety, the OCA argues, the utility must provide it at its sole cost, unless that obligation would prevent the utility from earning a return on its overall operations or would create an undue burden on existing customers. But while Section 1501 speaks to necessary extensions, it does not purport to speak to the economics of required extensions, much less does it suggest that the PUC was obliged to conclude that the entire cost of a water line extension must be borne by the utility. Indeed, Section 1501 later states in explicit terms that: "Subject to the provisions of this part **and the regulations and orders of the commission, every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service.**" *Id.* (emphasis supplied). Thus, in addition to the fact that the delegated power does not affirmatively restrict the PUC from authorizing customer contribution, the statute affirmatively recognizes that reasonable conditions may attach to the rendering of mandated service. Given the plain language of this construct, as well as the broad power delegated to the PUC to adopt "just and reasonable standards" under Section 1504, we hold that the PUC was authorized to adopt line extension regulations which accounted for economic factors.[16]

16. We reject the argument in the dissenting opinion below that the regulations are contrary to the legislative grant because they categorically eliminate public need from the equation. As the PAWC has explained, the distinction the regulations draw between bona fide service applicants and other applicants—i.e., requiring utility investment *only* when the request is made by a bona fide service applicant, as opposed to a developer, or a secondary home owner, or an applicant requesting special service, 52 Pa.Code § 65.1—show that public need is

■ We turn then to whether the "break even" approach adopted in the regulations is reasonable. In passing upon the reasonableness of any such discretionary agency action, this Court has noted, appellate courts must accord deference to the agency and may only overturn an agency determination if the agency acted in bad faith or the regulations constituted a "manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Rohrbaugh,* 727 A.2d at 1085 (citing *Slawek v. State Bd. of Medical Education and Licensure,* 526 Pa. 316, 586 A.2d 362, 365 (1991)). Here, the PUC, which has special expertise in this area, engaged in an extensive regulatory review process that began at a public meeting on November 10, 1993 and was not concluded until the final regulations were enacted on October 3, 1996. PUC Initial Decision at 28–29. During this process, the PUC held several public meetings, temporarily withdrew the proposed regulations at one point to consider certain concerns raised about them, and published a notice in the Pennsylvania Bulletin every time an event concerning the proposed regulations occurred. *Id.* Thus, there certainly was nothing arbitrary or unreasonable in the procedural background of the regulations.

With respect to substance, in its final order adopting the regulations, the PUC discussed existing appellate cases that had recognized that a utility's duty to provide line extensions is not unlimited. *See* 27 Pa. Bull. at 799. It also discussed the need to balance the rights of the utility, existing customers, and individuals seeking main line extensions. *Id.* Further, the PUC stated that the purpose behind the regulations at issue was to "create a fair, reasonable and predictable economic standard." *Id.* Ultimately, in the PUC's considered view, it was reasonable to require a utility to absorb the entire initial cost of a line extension, but only if the utility could expect that the annual revenue resulting from the extension would equal or exceed the annual cost of the project. If the project would

specifically accounted for. *See supra* note 15 and accompanying text. The fact that public need may trigger a mandated extension, however, is separate and apart from the question of whether the utility must always bear the entire cost of the project.

otherwise project as a net loss for the utility, however, the PUC determined that it was proper to authorize customer advances to the cost of constructing the extension, the amount of the customer contribution to be determined by the algebraic formula set forth in the regulation.

The PUC's exercise of its delegated power in this instance reveals no evidence of bad faith, unreasonableness or arbitrariness. In undertaking its evaluation, the PUC did not write upon a blank slate, but with the benefit of years of experience in such matters, including experience with what it deemed an unworkable, burdensome case-by-case approach to extension requests. Moreover, the Commission, though not obliged to adopt regulations consistent with the (intermediate appellate) judicial interpretations that existed in the absence of explicit regulations, *Elite Industries*, 832 A.2d at 431–32, nevertheless demonstrated an awareness of the existing case law and did not act inconsistently with it. *See e.g., Huntingdon, Inc. v. Pennsylvania Public Utility Comm'n*, 76 Pa. Cmwlth. 387, 464 A.2d 601, 603 (1983); *Lynch*, 594 A.2d at 818; *Colonial Products Co. v. Pennsylvania Public Utility Comm'n*, 188 Pa.Super. 163, 146 A.2d 657, 662 (1958); *Ridley Township*, 172 Pa.Super. 472, 94 A.2d 168. These cases recognize that, generally, water utilities are required to fund main line extension requests made by bona fide service applicants, but only so long as the project would not burden existing customers nor cause material economic harm to the companies. Although the OCA might prefer that a heavier burden be placed upon the utility,[17] there was nothing arbitrary or unreasonable in the PUC fixing the point at which the utility could be deemed to suffer a material economic harm

17. We agree with the Commonwealth Court that *Ridley Township*, properly read, does not require utilities to extend service, even if it is not profitable, so long as they receive an overall return on its entire operations. Rather, *Ridley Township* is one of the many intermediate appellate cases that generally posited that utility companies were obliged to provide the initial capital required for line extensions unless doing so would subject the company to "unreasonable expenditures" or would "unduly burden the public." *Ridley Township*, 94 A.2d at 171. Furthermore, *Ridley Township* was decided prior to the promulgation of the line extension regulations, which now control. If the regulations are valid, *Ridley Township* is no basis upon which to upset them.

from a mandated line extension as that point where the utility would face an out-of-pocket loss. It is that point where the utility would be forced to either absorb the loss or pass it on to existing customers.[18] Accordingly, we hold that the regulations are reasonable and, as such, there is no basis for this Court to interfere with them.

For the foregoing reasons, we affirm the order of the Commonwealth Court.

Chief Justice CAPPY and Justice SAYLOR, EAKIN and BAER join the opinion.

Former Justice NIGRO did not participate in the decision of this case.

Justice NEWMAN files a dissenting opinion.

Justice NEWMAN, dissenting.

The Majority concludes that the demonstration of public need for water, alone, is insufficient to require a water company to extend its water lines and service to the residents of Mount Pleasant Township (Township) without contributions from those residents in aid of construction. Based on this precept, the Majority affirms the Order of the Commonwealth Court to require contribution in aid of construction by the residents of the Township before the Pennsylvania American Water Company (PAWC) will begin the water line extensions.[1]

---

**18.** We also are unpersuaded by the OCA's argument that the revenue the PAWC could expect in future rate increases should require it to forward the entire cost of mandated line extension projects. In addition to the fact that this is a policy argument which does not prove the unreasonableness of the agency's regulatory scheme, the argument confuses two separate costs to utilities: costs associated with line extension and costs associated with regular service. The PAWC is subject to separate regulations for the establishment and increases of its rates. *See* 52 Pa.Code § 53.1 *et seq.* These requirements are separate and apart from the line extension regulations. Rates are intended to compensate the utility for its ongoing service, *i.e.*, providing regular water service, and are not required to be viewed as containing a component which compensates the provider for unrelated projects or expenditures, such as line extensions for the benefit of new customers.

**1.** The plight of these residents has been assumed by Irwin A. Popowsky (Consumer Advocate), Appellant in the matter before this Court.

Because I believe that the determination of the Public Utility Commission (Commission) is fundamentally flawed and would vacate and remand this matter for further findings, I must respectfully dissent.

The gravamen of this appeal is Consumer Advocate's challenge to the application of the Commission's line extension regulations. As noted by the Majority, these regulations were adopted in compliance with the substantive and procedural requirements of the Commonwealth Documents Law,[2] the Commonwealth Attorneys Act,[3] and the Regulatory Review Act.[4] However, I agree with Consumer Advocate that the regulations conflict with the duty that every utility has pursuant to Section 1501 of the Public Utility Code, 66 Pa.C.S. § 1501, to provide service to the public where a need for the service has been demonstrated.

It is beyond cavil that utility service is crucial to the well being of the public, which, because of the monopolistic nature of public utilities, generally has no other source for the service. Section 1501 provides that:

> Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, **extensions,** and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

66 Pa.C.S. 1501.

The PAWC certificate of public convenience includes many municipalities and territories in thirty-five counties in this Commonwealth, including Mount Pleasant Township. The Township has no alternative supplier to which it may legally turn for public water service. Further, it is undisputed that

---

**2.** Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102–1602.

**3.** Section 204(b) of the Act of October 15, 1980, P.L. 950, 71 P.S. § 732–204(b).

**4.** Act of June 25, 1982, P.L. 633, *reenacted and amended by*, Act of June 30, 1989, P.L. 73, 71 P.S. §§ 745.1 to 745.15.

the water supply in the Township is inadequate and that the water quality is poor. While PAWC has not refused to service the Township at all, it has refused to service the Township unless the residents, wishing to connect to service line extensions to receive the benefits of public water service, pay a non-refundable, non-reimbursable contribution in aid of construction of $2,255.00 per household. I believe this determination flies in the face of the statutory requirement that public utilities, as governmentally authorized monopolies, bear the cost of capitalizing the investment necessary to extend service to *bona fide* service applicants. When interpreting Section 1501, the appellate courts of this Commonwealth have generally concluded that the costs associated with maintaining and expanding the physical facilities necessary to provide utility service are the initial responsibility of the public utility.[5] In circumstances in which there is no public need for improvements or extensions in service, *e.g.*, when the proposed project involves special services or benefits only a particular customer or developer, the Commission and courts have approved the assessment of customer contributions.[6]

The Commission relies on its regulations found at 52 Pa. Code §§ 65.1 and 65.21–65.23, which establish a duty in a public utility to provide line extensions to *bona fide* service

**5.** *See Kossman v. Pa. Pub. Util. Comm'n*, 694 A.2d 1147 (Pa.Cmwlth. 1997); *Honey Brook Water Co. v. Pa. Pub. Util. Comm'n*, 167 Pa. Cmwlth. 140, 647 A.2d 653 (1994) *(en banc), petition for allowance of appeal denied*, 540 Pa. 587, 655 A.2d 518 (1995); *East Goshen Twp. v. Pa. Pub. Util. Comm'n*, 87 Pa.Cmwlth. 52, 486 A.2d 550 (1985); *Fairview Water Co. v. Pa. Pub. Util. Comm'n*, 55 Pa.Cmwlth. 96, 422 A.2d 1209 (1980); *McCormick v. Pa. Pub. Util. Comm'n*, 48 Pa.Cmwlth. 384, 409 A.2d 962 (1980); *Ridley Twp. v. Pa. Pub. Util. Comm'n*, 172 Pa.Super. 472, 94 A.2d 168 (1953); *Borough of Warren v. Pa. Pub. Serv. Comm'n*, 80 Pa.Super. 10 (1922).

**6.** *See Kossman v. Pa. Pub. Util. Comm'n*, 694 A.2d 1147 (Pa.Cmwlth. 1997) (development); *Lynch v. Pa. Pub. Util. Comm'n*, 140 Pa.Cmwlth. 599, 594 A.2d 816 (1991), *petition for allowance of appeal denied*, 529 Pa. 670, 605 A.2d 335 (1992) (single customer); *Huntingdon, Inc. v. Pa. Pub. Util. Comm'n*, 76 Pa.Cmwlth. 387, 464 A.2d 601 (1983) (residential development); *Colonial Prods. Co. v. Pa. Pub. Util. Comm'n*, 188 Pa.Super. 163, 146 A.2d 657 (1958) (single customer); *Borough of Phoenixville v. Pa. Pub. Util. Comm'n*, 3 Pa.Cmwlth. 56, 280 A.2d 471 (1971) (shopping center); *see also City of Altoona v. Pa. Pub. Util. Comm'n*, 168 Pa.Super. 246, 77 A.2d 740 (1951) (eight property owners).

applicants without customer contribution where the annual expected revenues equal or exceed the annual expenses and capital costs associated with the new line. 52 Pa.Code § 65.21(1). According to the regulations, if the annual revenue does not equal or exceed the line's annual costs, then the utility may require a contribution from customers that is proportional to the annual costs not covered by the annual revenue. 52 Pa.Code § 65.12(2). The regulations were adopted pursuant to Section 1501 of the Public Utility Code, which expressly authorizes a utility, with the approval of the Commission, to adopt "reasonable rules and regulations governing the conditions under which it shall be required to render service." 66 Pa.C.S. § 1501. The Commission determined that it is reasonable to require customer contributions to an extension if the contributions are required to prevent the utility from a negative return on investment, *i.e.*, the utility must realize at least a "break even" return on mandated extensions. The Commission believes that new customers should be required to contribute to the cost of a utility's extension when it is necessary to protect that utility's existing customers from excessive rates or to preserve the financial viability of the utility.

I believe that this "break-even analysis," which is the touchstone of the line extension regulations, is neither required nor consonant with the Public Utility Code. Section 1501 clearly requires a utility to provide safe and adequate service to an area lacking public water without customer contribution where a public need exists and the financial viability of the utility is not threatened. The statute does not include a caveat that "repairs, changes, alterations, substitutions, extensions, and improvements" are made only where the financial health or profitability of the utility can be maintained. The Commission rejected this public need argument in its adjudication, noting it has consistently held that public need does not invalidate the regulation's requirement for customer contribution where the cost of supplying service is more than the immediate return from that service.[7]

7. The Commission cites its previous determinations in *Popowsky v. Pennsylvania–American Water Company*, Docket No. R–00943155C001,

To advance his "public need" argument, Consumer Advocate relies principally upon the holding in *Ridley Township v. Pennsylvania Public Utility Commission*, 172 Pa.Super. 472, 94 A.2d 168 (1953). *Ridley* requires public utilities to provide service without customer contribution unless the utility can demonstrate material economic harm or undue burden upon existing customers. *Id.* at 171. In *Ridley*, twelve home-owners sought an extension of a public water utility's facilities to a residential section of a township, a part of which was already served by the utility. In addition, the township requested the installation of fire hydrants. Despite evidence showing that the extension would entail the expenditure of less than one-fourth of one percent of the company's current and accrued assets, the Commission concluded that it was "not economically feasible" for the utility to extend its mains and did not require the extension. *Id.* at 170.

The homeowners appealed, and the Superior Court re-versed. It found that pursuant to the Public Utility Code, a utility may not serve only the presently profitable territory covered by its franchise. The Superior Court reasoned as follows:

> A public utility cannot collect the cream in its territory and reject the skimmed milk.... If a portion of the territory served is not profitable, but the entire service produces a fair return on the investment, the utility may still be required to serve the unprofitable portion, if the rendering of such service does not result in an unreasonable burden on its other service....

> Ordinarily, it is not the business of the citizen or consumer to construct any part of a utility's system. There are, doubtless, instances where, under special circumstances, warranted by the evidence, the Commission may, in the

1997 WL 1050746, 1997 Pa. P.U.C. LEXIS 143 (Order entered June 9, 1997) (specifically rejecting the public need exception to the regula-tions); and *Collier Township v. Pennsylvania American Water Company*, Docket No. C-00934978 (Order entered March 18, 1996) (evidence of contaminated and insufficient wells did not overcome the economic standards set forth in the line extension regulations). I note that neither of these matters was reviewed by an appellate court.

exercise of its administrative discretion, withhold exercise of its power unless patrons offer to participate in the cost of construction. But no inflexible rule can be laid down; participation in construction costs cannot be exacted indiscriminately; and it cannot be required upon a mere showing that an extension will not immediately produce an adequate profit.

*Id.* at 171 (internal citations and quotation marks omitted). Thus, the Superior Court held that affected members of the public "are entitled to fire protection and domestic water service without subsidizing a large and prosperous utility." *Id.* at 172. Of even greater significance, the *Ridley* court rejected the position of the Commission that individual line extensions must be profitable for the utility, or customer contributions are required. The court observed that the "purpose of an inquiry upon a complaint for refusing an extension of facilities is ... to determine the effect of an extension upon the **total** return from the overall operation of the entire system." *Id.* at 170 (emphasis added). As did the Superior Court in *Ridley,* I find that the Commission erred in failing to analyze whether, by extending the service line to the Township residents, the total revenues and expenses would produce an impermissible rate of return or financial harm to the utility. There is a palpable distinction between securing a fair return and maintaining the current level of profitability, a distinction that was not explored in the hearings before the Commission. Because I believe that the regulations promulgated by the Commission, and their strict application, are at odds with Section 1501, I would vacate the Order of the Commonwealth Court and remand for additional findings. The statutory rule provides that "[e]very public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, **extensions,** and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public." 66 Pa.C.S. § 1501 (emphasis added). While the statute provides the Commission with the

authority to promulgate regulations to ensure that the statutory mandate is met, and while the statute permits utilities to formulate rules as to how it will conform to the statutory mandate, I believe that the General Assembly has decreed that the "accommodation, convenience, and safety of its patrons, employees, and the public" is the paramount concern.

On the established record, there can be little doubt that those portions of Mt. Pleasant Township requesting service are in need of a public water system. Moreover, whether one uses the figures of Consumer Advocate that 568 residents would use the service or the figure of PAWC that 744 residential customers would be served, this is clearly not a *de minimus* number and militates even more for a determination that public need is the overriding factor here. The degree of public need in this case is not one of mere accommodation or convenience but one affecting public health and safety, and I believe that the Commission erred in concluding that, absent customer contributions, the Utility need not extend water service to the affected area. The Commission should have evaluated the need for customer contributions on the basis of a fair overall return to the utility, not on the basis of whether the individual line extension would be profitable. Accordingly, because: (1) a utility is obligated by statute to supply service within its certificated area; (2) there is a demonstrated substantial need for water service in the Township; (3) there is no finding that extending service into the Township would have a detrimental effect on the total return on investment of PAWC, I believe that the Order of the Commonwealth Court should be vacated and the matter remanded for additional findings.