IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Alan Schmukler, :
              Petitioner :
               :
     v. :
               :
Pennsylvania Public Utility :
Commission, : No. 1102 C.D. 2019
              Respondent : Submitted: April 21, 2023


BEFORE:   HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE STACY WALLACE, Judge


OPINION BY
JUDGE COVEY                          FILED:  September 6, 2023

        Alan Schmukler (Petitioner) petitions this Court pro se for review of the Pennsylvania Public Utility Commission's (Commission) July 23, 2019 Final Order denying Petitioner's Exceptions to the Administrative Law Judge's (ALJ) Initial Decision (Decision) that denied Petitioner's formal complaint against PPL Electric Utilities Corporation (PPL) (Complaint). There are three issues before this Court: (1) whether the Commission properly interpreted Act 129 of 2008[1] (Act 129) as not including a smart meter opt-out for customers where the Pennsylvania Supreme Court later held that Section 2807(f)(2) of the Public Utility Code (Code)[2] mandates the system-wide installation of smart meter technology, including smart meters; (2) whether the Commission properly determined that Petitioner failed to prove that the installation of advanced metering infrastructure (AMI) meters on his

---

[1] Act of October 15, 2008, P.L. 1592, No. 129.

[2] 66 Pa.C.S. § 2807(f)(2).

property violates Section 1501 of the Code,[3] where Petitioner did not meet the preponderance of evidence standard; and (3) whether the Commission's determination was within its administrative discretion and supported by substantial evidence in accordance with Section 704 of the Administrative Agency Law (Law).[4, 5] After review, this Court affirms.

**Facts**

On August 11, 2017, Petitioner filed the Complaint challenging PPL's planned installation of a new AMI meter at Petitioner's service address, and alleging that smart meters are a health hazard and cause fires. On March 9, 2018, the ALJ held a telephone evidentiary hearing. On August 16, 2018, the ALJ issued the Decision dismissing the Complaint because Petitioner failed to prove by a preponderance of the evidence that the AMI meter installation constitutes unsafe or

---

[3] 66 Pa.C.S. § 1501 (relating to character of service and facilities).

[4] 2 Pa.C.S. § 704 (relating to disposition of appeals).

[5] Petitioner presented eight issues in his "QUESTIONS TO BE ANSWERED" in his brief: (1) whether the Commission and PPL are legally restrained from offering an accommodation to Petitioner; (2) whether a violation of Section 1501 of the . . . Code requires service that is both unsafe and unreasonable; (3) whether the required standard of evidence, i.e., conclusive causal connection, as ruled on by the Pennsylvania Supreme Court in *Povacz v. Pennsylvania Public Utility Commission*, 280 A.3d 975 (Pa. 2022), was properly conceived, and must Petitioner prove a conclusive causal connection to harm for all of humanity; (4) whether Petitioner proved by a preponderance of evidence that there is a conclusive causal connection between the smart meter's radio frequency fields and his adverse health effects; (5) whether Petitioner established that he has suffered from Electromagnetic Hypersensitivity for over 30 years; (6) whether the standard of evidence (conclusive causal connection) that Petitioner was held to is vastly higher than the standard to which the Commission and PPL were held; (7) whether the Commission and PPL are recipients of federal funds, and therefore required to abide by federal law as it overlaps with Pennsylvania law; and (8) whether moving a smart meter farther from Petitioner's home is a true and safe accommodation of his disability. Petitioner Suppl. Br. at 3. Because the Commission's "COUNTER[]STATEMENT OF THE QUESTIONS INVOLVED" encompass the pertinent issues before this Court, Commission Suppl. Br. at 4, and the issues presented in Petitioner's initial brief are subsumed in those issues, *see* Petitioner Br. at 14 (because the pages are not numbered in Petitioner's brief, the page numbers referenced herein reflect electronic pagination), this Court will address those issues accordingly.

unreasonable service under Section 1501 of the Code. The Decision also contained certain fire safety recommendations for PPL based on judicially noticed materials. Both parties filed Exceptions to the Decision. On July 24, 2019, the Commission filed its Final Order denying Petitioner's Exceptions, granting PPL's Exceptions, adopting the Decision as modified, and dismissing the Complaint. On July 24, 2019, Petitioner appealed to this Court.[6] On September 3, 2019, PPL filed a Notice of Intervention.[7]

On January 15, 2020, this Court stayed the proceedings in the instant matter pending the disposition of three consolidated appeals pending before this Court involving the same or similar issues. Those consolidated appeals were *Povacz v. Pennsylvania Public Utility Commission* (Pa. Cmwlth. No. 492 C.D. 2019, filed October 8, 2020), *Murphy v. Pennsylvania Public Utility Commission* (Pa. Cmwlth. No. 606 C.D. 2019, filed October 8, 2020), and *Randall v. Pennsylvania Public Utility Commission* (Pa. Cmwlth. No. 607 C.D. 2019, filed October 8, 2020) (collectively, *Povacz* appeals). On October 8, 2020, this Court affirmed in part, reversed and remanded in part, and vacated and remanded in part the Commission's Orders underlying the *Povacz* appeals. *See Povacz v. Pa. Pub. Util. Comm'n*, 241 A.3d 481 (Pa. Cmwlth. 2020) (*Povacz* - Cmwlth.), *aff'd in part, rev'd in part*, *Povacz*

---

[6] This Court's review of a [Commission] adjudication determines "whether constitutional rights have been violated, an error of law has been committed, or the Commission's findings and conclusions are, or are not, supported by substantial evidence." *Barasch v.* [*Pa.*] *Pub*[.] *Util*[.] *Comm*[*'n*], . . . 493 A.2d 653, 655 ([Pa.] 1985). As to questions of law, this Court's scope of review is plenary, and its standard of review is *de novo*. *See Popowsky v.* [*Pa.*] *Pub*[.] *Util*[.] *Comm*[*'n*], 910 A.2d 38 . . . ([Pa.] 2006).

*Twin Lake Utils., Inc. v. Pa. Pub. Util. Comm'n*, 281 A.3d 384, 389 n.5 (Pa. Cmwlth. 2022).

[7] On January 10, 2020, Petitioner filed a Petition to Include Petitioner's Original 27 Looseleaf Binder Exhibits in the Certified Record (Application to Include Exhibits).

*v. Pa. Pub. Util. Comm'n*, 280 A.3d 975 (Pa. 2022) (*Povacz*). In *Povacz* - Cmwlth., this Court ruled:

> [W]e affirm the [Commission's] rejection of [the c]onsumers' constitutional challenge. We reverse the [Commission's] conclusion that it lacks authority to accommodate [the c]onsumers' desire to avoid [radio frequency (]RF[)] emissions from smart meters and vacate the [Commission's] determination that such accommodation would not be reasonable. We affirm the [Commission's] determination of the burden of proving harm. We affirm the [Commission's] findings of fact. We remand this matter to the [Commission] for determinations of whether accommodations are appropriate for each of the [c]onsumers, and if so, what those accommodations should be.

*Id*. at 494-95. All parties to the *Povacz* appeals filed Petitions for Allowance of Appeal (Appeal Petitions) in the Pennsylvania Supreme Court. Due to the status of the *Povacz* appeals, on December 15, 2020, this Court stayed the proceedings in the instant matter and the other pending smart meter appeals.

On May 12, 2021, the Pennsylvania Supreme Court granted the Appeal Petitions in part. *See Povacz v. Pa. Pub. Util. Comm'n*, 253 A.3d 220 (Pa. 2021) (*Povacz* - Allocatur). The Pennsylvania Supreme Court granted review as to the following issues:

> (1) Did the Commonwealth Court commit an error of law by concluding that the statute does not mandate universal deployment of smart meters, which is contrary to the plain and unambiguous statutory language of Section 2807(f)(2) of the . . . Code . . . ?
>
> (2) On a question of first impression involving Act 129's smart meter deployment mandate, did the Commonwealth Court abuse its discretion by interpreting the . . . Code in a manner that violated the rules of statutory construction and disregarded the legislative intent of the General Assembly?

4

(3) Did the Commonwealth Court commit an error of law by articulating a burden of proof under Section 1501 of the . . . Code . . . that could result in a utility being found in violation of the Code without evidence of harm?

. . . .

[(4)] Did the [Commonwealth] Court err when it concluded that Act 129 allows individual [c]onsumers to reject or "opt-out" of smart meter technology, on the grounds that Act 129 requires that "[e]lectric distribution companies [(EDCs)] shall furnish smart meter technology," [where] Webster's Dictionary defines "furnish" as meaning "to provide with what is needed; . . . supply, give," and that this definition of "furnish" does not imply that the recipient is forced to accept that which is offered?

. . . .

[(5)] Did the [Commonwealth C]ourt err as a matter of law by upholding the [Commission's] interpretation of Section 1501 of the . . . Code as requiring[,] as to issues of safety[,] proof of a "conclusive causal connection" between RF exposure from smart meters and harm to [the p]etitioners, when this heavy and unprecedented burden is not compelled by the language of the statute, where the statutory and dictionary definition of the word "safe" includes protection from the possibility of harm, not just the conclusively proven certainty of harm, and where imposition of this burden would render it impossible for [the p]etitioners to prove their cases?

*Povacz* - Allocatur, 253 A.3d at 221.

On August 16, 2022, the Pennsylvania Supreme Court issued its Opinion in the *Povacz* appeals. *See Povacz.* The *Povacz* Court held:

[W]e reverse the Commonwealth Court's ruling that Act 129 does not mandate the installation of smart meters. We affirm the Commonwealth Court's conclusion that the [Commission] did not err in finding that [the c]ustomers failed to meet their burden of proving, by a preponderance of the evidence, a conclusive causal connection between RF emissions from smart meters and adverse human

5

health effects. We reverse the Commonwealth Court's remand to the [Commission] for consideration of whether [the c]ustomers established that smart meter service is unreasonable under Section 1501 [of the Code].

*Id*. at 1014.

By October 6, 2022 Order, this Court lifted the stay in the instant matter and directed Petitioner to file a supplemental brief addressing the *Povacz* decision, including its effect on his pending petition for review, by November 7, 2022. This Court further directed the Commission and PPL to file briefs within 30 days of service of Petitioner's supplemental brief. All briefs have been filed and the matter is ripe for disposition.

## Discussion

**1. Act 129**

Initially, Act 129 added Section 2807(f) of the Code which provides, in relevant part:

> **Smart meter technology and time of use rates.--**
>
> (1) Within nine months after the effective date of this paragraph, [EDCs] shall file a smart meter technology procurement and installation plan with the [C]ommission for approval. The plan shall describe the smart meter technologies the [EDC] proposes to install in accordance with paragraph (2).
>
> (2) [EDCs] shall furnish smart meter technology as follows:
>
>> (i) Upon request from a customer that agrees to pay the cost of the smart meter at the time of the request.
>>
>> (ii) In new building construction.
>>
>> (iii) In accordance with a depreciation schedule not to exceed 15 years.

6

. . . .

(5) By January 1, 2020, or at the end of the applicable generation rate cap period, whichever is later, a default service provider shall submit to the [C]ommission one or more proposed time-of-use rates and real-time price plans. The [C]ommission shall approve or modify the time-of-use rates and real-time price plan within six months of submittal. The default service provider **shall offer the time-of-use rates and real-time price plan to all customers that have been provided with smart meter technology under paragraph (2)(iii). Residential or commercial customers may elect to participate in time-of-use rates or real-time pricing**. The default service provider shall submit an annual report to the price programs and the efficacy of the programs in affecting energy demand and consumption and the effect on wholesale market prices.

. . . .

(7) An [EDC] **may recover reasonable and prudent costs of providing smart meter technology under paragraph (2)(ii) and (iii)**, as determined by the [C]ommission. . . .

66 Pa.C.S. § 2807(f) (text emphasis added).

Act 129 defines "smart meter technology" as follows:

[T]he term "smart meter technology" means technology, including metering technology and network communications technology capable of bidirectional communication, that records electricity usage on at least an hourly basis, including related electric distribution system upgrades to enable the technology. The technology shall provide customers with direct access to and use of price and consumption information. The technology shall also:

(1) Directly provide customers with information on their hourly consumption.

(2) Enable time-of-use rates and real-time price programs.

7

(3) Effectively support the automatic control of the customer's electricity consumption by one or more of the following as selected by the customer:

    (i) the customer;

    (ii) the customer's utility; or

    (iii) a third party engaged by the customer or the customer's utility.

66 Pa.C.S. § 2807(g).

In its Final Order, the Commission explained:

While Act 129 does not provide customers a general "opt-out" right from smart meter installation at a customer's residence, a customer's formal complaint that raises a claim under Section 1501 of the Code . . . related to the safety of a utility's installation and use of a smart meter at the customer's residence is legally sufficient to proceed to an evidentiary hearing before an ALJ.

As the party seeking affirmative relief from the Commission, the complainant in a formal complaint proceeding has the burden of proof. [*See* Section 332(a) of the Code,] 66 Pa.C.S. § 332(a). The burden of proof is the "preponderance of the evidence" standard. To establish a fact or claim by a preponderance of the evidence means to offer the greater weight of the evidence, or evidence that outweighs, or is more convincing than, by even the smallest amount, the probative value of the evidence presented by the other party.

Final Order at 9 (citations omitted).

In *Povacz*, our Supreme Court concluded:

Act 129 does mandate that EDCs furnish smart meters to all electric customers within an electric distribution service area and does not provide electric customers the ability to opt out of having a smart meter installed. An electric customer with concerns about smart meters may seek an accommodation from the [Commission] or EDC,[FN5] but to obtain one the customer must establish by a preponderance of the evidence that installation of a smart

8

meter violates Section 1501 [of the Code]. In this case, the electric customers did not prove that installation of a smart meter at their premises violates Section 1501 [of the Code]; therefore, the [Commission] was not required to prescribe any remedial action. Having so concluded, we reverse the Commonwealth Court's ruling that Act 129 does not mandate the installation of smart meters. Additionally, we clarify the use of the conclusive causal connection standard for proving a violation under Section 1501 [of the Code] and hold that a preponderance of the evidence is the standard that applies to claims brought under Section 1501 [of the Code]. Finally, we reverse the Commonwealth Court's remand of the case to the [Commission].

> [FN]5 This holding does not preclude an electric utility from providing a reasonable accommodation to an electric customer in the absence of a Section 1501 [of the Code] violation pursuant to a customer service policy.

*Povacz,* 280 A.3d at 983-84.

The *Povacz* Court explained:

Contrary to [the c]ustomers' claim that [Section 2807](f)(5) [of the Code] supports their notion of customer opt-out, providing a customer with optional money-saving services makes sense only in the context of the mandatory system-wide installation of smart meter technology. The language highlighted above indicates that time-of-use rates and real-time price plans are optional services available to all customers whose Legacy meters[8] have been replaced with smart meters. If [Section 2807](f)(2)(iii) [of the Code] applies only to smart meters furnished to early technology adopters and new construction customers, then all other customers connected to the electric distribution system would not have smart meters and, therefore, could not elect to participate in the optional services. That result conflicts with the purpose of the [Energy Efficiency and

---

[8] Legacy meters are the traditional meters that suppliers cannot communicate with or access remotely.

Conservation] program to reduce electric consumption and demand across the Commonwealth.

. . . .

[Further,] [t]he recovery of costs by EDCs makes sense only in the context of a mandatory system-wide installation of smart meter technology, as one such cost would include the removal and depreciation of Legacy meters. The lack of a reference in [Section 2807](f)(7) [of the Code] to early technology adopters identified in [Section 2807](f)(2)(i) [of the Code] is obvious - a customer who requests the installation of smart meter technology in advance of the schedule in a [Commission]-approved plan must pay for the smart meter at the time of request. Thus, there is no cost for EDCs that furnish smart meters to early technology adopters to recover. 66 Pa.C.S. § 2807(f)(2)(i). If [Section 2807](f)(2)(iii) [of the Code] applies only to smart meters furnished to new building construction, then the reference to [Section 2807](f)(2)(ii) [of the Code] in [Section 2807](f)(7) [of the Code] is superfluous.

*Povacz*, 280 A.3d at 997-98. Accordingly, because the Pennsylvania Supreme Court later held that Section 2807(f)(2) of the Code mandates the system-wide installation of smart meter technology, including smart meters, the Commission properly interpreted Act 129 that it does not include a smart meter opt-out for customers.

### 2. Section 1501 of the Code

Section 1501 of the Code provides, in relevant part:

**Every public utility** shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and **shall make all such** repairs, changes, alterations, substitutions, extensions, and **improvements in or to such service** and facilities **as shall be necessary or proper for the accommodation**, **convenience**, **and safety of its patrons**, employees, and the public.

66 Pa.C.S. § 1501 (emphasis added).

10

The *Povacz* Court instructed:

> A customer seeking affirmative relief from the [Commission] must prove by a preponderance of the evidence that the named utility was responsible or accountable for the problem described in the complaint and that the offense was a violation of the Code, a [Commission] regulation or [o]rder, or a violation of a [Commission]-approved tariff. [*See*] 66 Pa.C.S. §§ 332(a), 701; *Samuel J. Lansberry, Inc. v. Pa. Pub. Util. Comm'n*, . . . 578 A.2d 600 ([Pa. Cmwlth.] 1990)[.] . . .

> Although Act 129 does not provide an electric customer with the right to opt-out of the installation of a smart meter at their residence, they [sic] may file a complaint raising a claim that installation of a smart meter violates Section 1501 of the Code.

> . . . .

> Pursuant to [] [S]ection [1501 of the Code], an EDC (as a public utility) must provide service that is, *inter alia*, both safe and reasonable. **To carry their** [sic] **burden of proof on a Section 1501 [of the Code] claim**, **a smart meter challenger may be required to present medical documentation and/or expert testimony demonstrating that the furnishing of a smart meter constitutes unsafe or unreasonable service** in violation of Section 1501 [of the Code] under the circumstances presented.

*Povacz*, 280 A.3d at 999-1000 (italics and bold emphasis added; footnote omitted).

> In its Final Order, the Commission explained:

> [I]n order to prevail in a Section 1501 [of the Code] claim against an EDC alleging that an AMI meter caused or will cause adverse health effects or harm to human health, the [c]omplainant must demonstrate by a preponderance of the evidence a "conclusive causal connection" between the harm to human health and the RFs from the AMI meter.

Final Order at 14.

11

The *Povacz* Court expounded:

"Conclusive causal connection" means that the proffered evidence must support the conclusion that a causal connection existed between a service or facility and the alleged harm. It is not possible for evidence that is inconclusive to be sufficient to meet the preponderance of the evidence standard. Inconclusive means that the evidence does not lead to a conclusion of a definite result one way or the other. While the preponderance of the evidence standard is not stringent, it does require that the plaintiff's evidence ever so slightly (like, with the weight of a feather) supports the plaintiff's contention. Evidence that does not support a conclusion (or is inconclusive) cannot meet that minimal burden. *Accord Ethan Habrial v. Metro*[.] *Edison Co*[.], No. C-2018-3005907, 2020 WL 3840469, at *3 (Pa. P.U.C. June 29, 2020) ("The decision of the Commission must be supported by substantial evidence. 2 Pa.C.S. § 704. 'Substantial evidence' is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. More is required than a mere trace of evidence or a suspicion of the existence of a fact sought to be established."). Thus, where scientific evidence is required to establish the safety of a service or facility, use of the evidentiary standard of "conclusive causal connection" to assess the evidence is correct.

*Povacz*, 280 A.3d at 1006-07.

Here, Petitioner argues:

[] [P]etitioner here asserts that he has demonstrated a conclusive causal connection of harm to himself from smart meter radiation, and that he need not demonstrate harm to all of humanity. He has a disability of Electromagnetic Hypersensitivity (EHS) which is protected under law by the Americans with Disabilities Act [(ADA)][,][9] (also [t]he Fair Housing [Amendments] Act [of 1988])[,][10] [t]he [ADA] Amend[ments Act of 2008] (ADAA) and [t]he United States [(U.S.)] Access

---

[9] 42 U.S.C. §§ 12101-12213.
[10] 42 U.S.C. §§ 3601-3631.

12

Board[11] [sic] includes electromagnetic sensitivity in its guidelines: (*See* Petitioner[] Br[.] . . . [at] 51-53.)

The ADA as amended does not require, nor should the [Commission], that a situation be unsafe for all of humanity, but only for someone with a disability who belongs to a protected class. An analogy will clarify. Epilepsy is a disability that can be aggravated by exposure to flashing lights. A person with epilepsy who requests an accommodation in a work or housing situation[] does not have to prove that flashing lights trigger epilepsy in all people, just those with epilepsy.

Petitioner Suppl. Br. at 8-9 (italics added).

In its Final Order, the Commission concluded:

Upon review of the record on this issue, the [] Decision and the applicable law, we affirm the ALJ's conclusion that [**Petitioner**] **did not meet his burden of proof regarding his claim that PPL's smart meter caused or will cause adverse health effects <u>for</u>** [**Petitioner**]. Specifically, we affirm the ALJ's finding that [**Petitioner**] **failed to demonstrate a conclusive causal connection between the low-level RF fields from a PPL smart meter and adverse health effects <u>for</u>** [**Petitioner**].

Final Order at 43 (bold and underline emphasis added). Thus, the Commission did not require Petitioner to prove that use of a smart meter is "unsafe for all of humanity[,]" only that it is unsafe for Petitioner. Petitioner Suppl. Br. at 9. Accordingly, the Commission properly determined that Petitioner failed to prove that AMI meter installation on his property violated Section 1501 of the Code, when he did not meet the preponderance of evidence standard.

---

[11] "The [U.S.] Access Board is an independent federal agency that promotes equality for people with disabilities through leadership in accessible design and the development of accessibility guidelines and standards." https://www.access-board.gov/about/ (last visited Sept. 5, 2023).

### 3. Section 704 of the Law

Section 704 of the Law provides, in relevant part:

The court shall hear the appeal without a jury on the record certified by the Commonwealth agency. After hearing, **the court shall affirm the adjudication unless it shall find** that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or **that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence**.

2 Pa.C.S. § 704 (emphasis added). "Evidence that does not support a conclusion (or is inconclusive) cannot meet that minimal burden. *Accord Ethan Habrial . . . , . . .* at *3 . . . (*'**The decision of the Commission must be supported by substantial evidence**. 2 Pa.C.S. § 704. . . .'*)." *Povacz*, 280 A.3d at 1007 (emphasis added).

Petitioner argues:

The [Commission] dismissed [Petitioner's] [C]omplaint for failure of [Petitioner] to prove by a preponderance of the evidence that the installation of the smart meter constitutes unsafe or unreasonable service under [Section 1501 of the Code]. But how could [Petitioner] prove his [C]omplaint by a preponderance of the evidence if virtually all of his credible evidence was excluded? The exclusions were based on manifestly unreasonable judgements by the ALJ. They included, but were not limited to, rejecting letters from [four] doctors[,] as well as the doctors' vitae and evidence from [Petitioner's] credible witness, William Bathgate [(Bathgate)], while relying on evidence from PPL['s] [] witnesses, one of whom[,] [Dr.] Mark Israel [(Dr. Israel),]) was not qualified[,] and the other[,] [Dr.] Christopher Davis [(Dr. Davis),] was not credible. In ruling against all of [Petitioner's] Exceptions, the ALJ and the [Commission] relied on testimony from PPL's witness [Dr.] Israel, who was unqualified as an expert in the matter of EHS (by his own admission)[,] and therefore that testimony was

14

unreliable and his evidence was neither substantial nor competent.

Petitioner Br. at 62 (internal record citation omitted).

Here, with respect to Petitioner's evidence, the Commission opined in its Final Order:

> [W]e acknowledge that [Petitioner's] case included his competent lay testimony as to the health symptoms he has experienced historically and since the time an AMI meter ha[d] been installed at his [n]eighbor's [a]ddress. [Petitioner] also presented the expert testimony of Bathgate, whom the [ALJ] accepted as an expert in electrical engineering but not as a medical expert, for the purpose of explaining [] Bathgate's theories as to how the RF fields from PPL's AMI meters will cause harm to human health. [Petitioner] did not present a qualified expert to testify on the issue of the cause of his medical issues in this proceeding. [Petitioner] did, however, present numerous exhibits, i.e., [Petitioner] Exhibit Nos. 1-10, and 12-27, for the purpose of corroborating his claims about his health problems and to support his claims that RF fields from PPL's AMI meters caused, exacerbated or will cause or exacerbate his health problems. Included in these [e]xhibits, among other things, was a letter from a family medicine practitioner and three letters from homeopathy practitioners stating that [Petitioner] has EHS[];[12] however, no actual medical

---

[12] Regarding the letters, the Commission noted:

> Even if we were to give the four letters more weight, . . . [PPL's expert,] Dr. Israel testified that "[n]one of these letters provide any useful diagnostic medical information." Rather, Dr. Israel found that "they have the appearance of reiterating information that likely was provided by the patient." For example, Dr. Israel testified that the letter from the family medicine practitioner "does not say when the diagnosis was made, who made it, what medical examination and medical criteria were involved in the diagnosis, or what course of treatment, if any, has been provided by medical professionals since the diagnosis[,] including by the author of the letter." These are all important factors related to any diagnosis, because there are [sic] no established medical criteria for the diagnosis or treatment of [idiopathic environmental intolerance].

15

records were submitted by [Petitioner] to corroborate his claims of EHS symptoms.

Final Order at 45 (emphasis added).

Relative to Dr. Israel's testimony, the Commission expounded:

Dr. Israel[] was the only expert qualified in this proceeding in medicine and medical research, particularly regarding RF fields and human health. Dr. Israel testified to a reasonable degree of medical certainty that there is no reliable medical basis to conclude that RF fields from the AMI meters being used by PPL will cause or contribute to the development of illness or disease. Dr. Israel's unequivocal opinion was offered to a reasonable degree of medical certainty based upon his review of available scientific studies, research and reports on the impacts of RF fields on [idiopathic environmental intolerance], insomnia, and adverse health effects. Dr. Israel's testimony was not rebutted or contradicted by any expert in this proceeding. Dr. Israel's expert opinion meets PPL's required burden of production and constitutes legally competent evidence to support a finding of fact that there is no causal connection between RF fields from a PPL AMI meter and adverse human health effects.

Final Order at 49 (footnote and record citations omitted).

Relative to Dr. Davis' testimony, the Commission explicated:

Dr. Davis was qualified as an expert witness in the area of electrical engineering, among other areas. The [Petitioner's] Exceptions do not present any reason to disqualify Dr. Davis or question the credibility of his testimony in this proceeding. Dr. Davis testified credibility [sic] that the new AMI meter is not a fire risk due to inadequate surge protection, as alleged by [Petitioner] and his expert witness, [] Bathgate. Dr. Davis' opinion was further bolstered by [Scott] Larson's [(Larson)][13] testimony that the new digital meter, as

Final Order at 46 n.17 (record citations omitted).

[13] [] Larson holds a Bachelor of Science degree in Electrical Engineering Technology from the Pennsylvania College of

16

compared to the analog meter, can better withstand damage from a surge because of the padding materials that are utilized when building transformers. [] Larson testified that the padding materials are tested to withstand up to 6,000 volts. [] Larson testified that the new AMI meter's surge protection is not functionally different than the current meter.

Moreover, Dr. Davis credibility [sic] testified that the smart meters can actually help people from having a fire because of the temperature alarms. Regarding such alarms, [] Larson's unrebutted testimony showed that the new AMI meters are equipped with software and mechanisms that better alert PPL if there is an issue with overheating. Specifically, there is a heat alarm set within the meter software program that alerts the [EDC] when the temperature of the meter hits an established level. [] Larson testified that PPL takes [15]-minute interval temperature readings from the meter in order to track the meter's temperature and identify any current issues or problematic trends. If PPL detects an issue with the meter's temperature, the [EDC] will dispatch a technician to investigate.

Final Order at 61 (quotation marks and internal citations omitted).

The Commission concluded:

[Petitioner] had the burden of proving that the smart meters used by PPL [] present a fire safety hazard, and he did not carry this burden. Rather, PPL [] established that there is no fire hazard created by the installation of its smart meters, and [Petitioner] failed to overcome the evidence presented by [PPL].

Final Order at 61-62. This Court discerns no error in the Commission's conclusion.

Accordingly, the Commission's determination was within its administrative

---

Technology. [] Larson is a Senior Engineer at PPL's Meter Shop in Hazleton, Pennsylvania, where he deals with the day-to-day meter testing operations at the facility. Prior to joining PPL, [] Larson worked for Lockheed Martin's field service team as an Electrical Engineer in charge of fire repair and radar systems.

Final Order at 6.

17

discretion and is supported by substantial evidence in accordance with Section 704 of the Law.

## Conclusion

For all of the above reasons, the Commission's Final Order is affirmed.[14]

_____
ANNE E. COVEY, Judge

Judge Fizzano Cannon did not participate in the decision in this matter.

---

[14] Petitioner's Application to Include Exhibits is dismissed as moot.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Alan Schmukler,                          :
                    Petitioner           :
                                         :
        v.                               :
                                         :
Pennsylvania Public Utility              :
Commission,                              :      No. 1102 C.D. 2019
                    Respondent           :

## O R D E R

AND NOW, this 6th day of September, 2023, the Pennsylvania Public Utility Commission's July 23, 2019 Final Order is AFFIRMED. Alan Schmukler's (Petitioner) Application to Include Petitioner's Original 27 Looseleaf Binder Exhibits in the Certified Record is DISMISSED as moot.

_____
ANNE E. COVEY, Judge